ECF 75IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

UNITED STATES OF AMERICA
*Plaintiff*,

v.

HECTOR HERNANDEZ VILLAPANDO, *et al*.
*Defendants*.

Criminal No. ELH-16-159

**MEMORANDUM OPINION**

Hector Hernandez Villapando and his sons, Hector Hernandez Barba and Enixae Hernandez Barba, defendants, were indicted on April 19, 2016, on the charge of conspiracy to distribute and possess with intent to distribute five kilograms or more of cocaine, in violation of 21 U.S.C. §§ 841(a)(1), 846. *See* ECF 26.[1] A Superseding Indictment was filed almost a year later, on March 16, 2017. ECF 91.

To avoid confusion among the defendants, I shall refer to Hector Hernandez Villapando as "Villapando." And, I shall refer to Hector Hernandez Barba and Enixae Hernandez Barba by their first names.

The defendants filed several pretrial motions. At a hearing on March 17, 2017, both evidence and argument were presented. The Court ruled on several of the motions at the hearing (*see* ECF 98), but three motions remain for disposition. They are described below.

Hector filed a Motion to Suppress Statements and Tangible Evidence (ECF 41),[2] primarily arising from the warrantless arrest of the defendants and the recovery from Hector of

[1] William Cornish was also indicted. However, he entered a plea of guilty on August 3, 2016, and was sentenced on October 18, 2016. *See* ECF 51; ECF 52; ECF 66; ECF 67.

[2] The government has represented that no statements are in issue.

keys to a warehouse in Linthicum Heights, Maryland. Hector also filed a Motion for Relief from Prejudicial Joinder and to Sever. ECF 42. Enixae filed a Motion to Suppress Evidence (ECF 71), challenging a residential search conducted pursuant to a search and seizure warrant issued by a Maryland State judge at 10:45 p.m. on April 8, 2016. The search warrant was based on the Application and Affidavit of Special Agent Ronald Sparrow of the Drug Enforcement Administration ("DEA"). *See* ECF 71-1; *see also* ECF 75.[3]

For the reasons that follow, I shall deny the motions.

## I. Factual Summary[4]

DEA Special Agents Ronald Sparrow and Susannah Wood were, at the relevant time, assigned to Group 51, HIDTA (High Intensity Drug Trafficking Area), in Baltimore. The DEA received information in August 2015 from a confidential informant ("CI") with respect to a group of individuals believed to be trafficking large amounts of cocaine into Maryland.

[3] The search and seizure warrant and the "Application And Affidavit For Search And Seizure Warrant" are docketed at ECF 71-1 and at ECF 75. They were received in evidence at the hearing as a defense exhibit. However, for convenience, I shall cite to ECF 75, rather than to the defense exhibit.

Hector and Villapando also filed motions to adopt the motions filed by the codefendants. *See* ECF 40 (Hector); ECF 76 (Villapando). I granted those motions. ECF 98.

[4] The factual summary is gleaned from the evidence and exhibits presented at the motions hearing, including the testimony of DEA Special Agent Susannah Wood and the "Application And Affidavit For Search And Seizure Warrant" of DEA Special Agent Ronald Sparrow. Agent Wood's testimony was largely consistent with Agent Sparrow's Affidavit. But, in general, the Affidavit is more detailed than the testimony of Agent Wood.

As discussed, *infra*, with respect to a probable cause review of the search warrant application, I am limited to the content of the "four corners." *Owens v. Lott*, 372 F.3d 266, 277 (4th Cir. 2004). Therefore, to the extent that Wood's testimony was consistent with the Affidavit, I shall cite only to the Affidavit. Unfortunately, I do not have a hearing transcript with respect to the testimony of Agent Wood. To the extent that Agent Wood testified to information not set forth in the Affidavit, I will cite to her testimony, but consider it only to the extent that it is relevant to the basis for the warrantless arrest of the defendants.

According to Agent Sparrow, the CI was "found to be reliable and accurate," and the information provided by the CI was "independently corroborated." ECF 75 at 9.

In connection with the group's drug trafficking, the CI advised the DEA that the group was using a warehouse located at Suite 104, 7110 Golden Ring Road in Baltimore. ECF 75 at 8. Further, the CI stated that shipments of cocaine came every two to three weeks. *Id.* In addition, the CI reported that the group used a box truck and a cargo van to transport controlled dangerous substances. ECF 75 at 12.

The business operating from that premises was known as KMKJ Trucking LLC. However, by July 31, 2015, that business had been evicted. ECF 75 at 10. Investigators later identified Unit L, 717 Hammonds Ferry Road, in Linthicum Heights, Maryland, as the warehouse utilized by the individuals previously suspected of drug trafficking at the warehouse on Golden Ring Road.[5]

After the eviction from the Golden Ring Road location, DEA agents conducted interviews of persons associated with neighboring businesses. One individual ("Source of Information" or "SOI") reported that he/she had not observed any legitimate business activity at Suite 104. Moreover, the Source of Information indicated that, every two to three weeks, a tractor-trailer arrived at night. *Id.* at 9. Notably, the SOI entered the vacated premises and saw "large industrial size bags of paprika inside" Suite 104. ECF 75 at 10. According to Special Agent Sparrow, paprika is used to mask the odor of narcotics. *Id.*

Bob's Overhead Door was also a business neighbor at Golden Ring Road. An associate at that business ("SOI-2") confirmed that he/she never saw activity at Suite 104 during the day. *Id.* SOI-2 also recalled that a forklift had been left at Suite 104. *Id.* Investigation revealed that

[5] Government's Exhibit 1 is the lease for 717 Hammond Ferry Road. The lessor is T. Wayne Mahone.

the forklift had been sold to "Juan" on February 5, 2015, for cash, and delivered to Suite 104. ECF 75 at 10. According to Agent Wood, forklifts are used to move palettes in which drugs are secreted.

A 2007 Dodge Sprinter box truck had been parked outside the rear of Suite 104 at the Golden Ring Road location. *Id.* On August 4, 2015, it was towed by Mc-N-Mc Towing Company. ECF 75 at 10. The DEA agents traced ownership of the vehicle to Villapando. Moreover, Villapando paid storage fees to Mc-N-Mc Towing Company, in cash, between August and December 2015. *Id.* According to Agent Wood, Villapando, along with the wife of Enixae, eventually retrieved the truck from the towing company. *See also* ECF 75 at 10-11.

The DEA obtained a copy of Villapando's driver's license from "Management," which "listed" an address for him in Calexico, California. ECF 75 at 11. According to Agent Wood, Calexico is located on the Mexican border and is a known source of drug importation to the United States.

The CI positively identified a driver's license photograph of Villapando as one of the individual's involved in the distribution of cocaine in Baltimore.[6] ECF 75 at 11-12. In addition, Agent Wood stated that the CI identified a photograph of Enixae. Moreover, investigation revealed that both Villapando and Enixae had been arrested in 2005 in Calexico on drug charges. *Id.* at 12.

DEA investigators identified 106 John Avenue in Linthicum Heights, Maryland as "a residence associated with the Hernandez DTO." ECF 75 at 14. They initiated surveillance of that residence on February 19, 2016. *Id.* Investigators observed a white 2004 Ford van,

[6] The Affidavit refers to Villapando as Hector Manuel Hernandez. As noted, he is identified in the Indictment as Hector Hernandez Villapando. No issue was raised with respect to the identity of Villapando.

Maryland Tag No. 8BW0037 (the "Van"), parked in the driveway of the John Avenue residence. *Id.* They also saw a "Hispanic female," believed to be Enixae's wife, leave the residence on that date and enter the Van. *Id.* She drove to several banks, a gas station, and also to an apartment building located at 10326 Hickory Ridge Road in Columbia, Maryland. *Id.*

A canine scan of the Van was conducted at about 6:20 p.m. on February 19, 2016, by a certified drug detection dog. *Id.*at 14-15. The dog "produced a positive response" for the presence of controlled dangerous substances, including cocaine. *Id.* at 15.[7]

The Affidavit recounts that on February 19, 2016, after the positive canine alert, Agent Wood applied for a warrant for a GPS tracking device for the Van. *Id.* It was approved by Anne Arundel County District Judge Thomas Miller. *Id.* The device was installed on the Van on February 20, 2016. *Id.*

On February 24, 2016, Villapando was observed exiting the Van and entering Apartment 624 at 10326 Hickory Ridge Road. ECF 75 at 16-17. Through the use of the court-authorized surveillance equipment, the Van was also detected on March 2, 2016, travelling from the area of Hickory Ridge Road in Columbia to 106 John Avenue in Linthicum Heights.

At about 9:00 a.m. on that date, the Van left John Avenue and proceeded to a multi-unit business park warehouse located at 717 Hammonds Ferry Road in Linthicum Heights. ECF 75 at 16. It then proceeded to three banks, before returning to the Hammonds Ferry Road location at 1:17 p.m. *Id.* At that time, the Van parked in front of Unit L at the warehouse. *Id.* There was no business name or placard on Unit L, however. *Id.* at 17. Similarly, Agent Wood testified that, during the investigation, there was no sign of any legitimate business activity at Suite L at

[7] Apparently, the scan was conducted while the Van was parked at an Exxon station. *See* Wood testimony.

the Hammonds Ferry Road location, and black paper was used to cover the window, concealing the inside from public view.

At about 1:30 p.m. on March 2, 2016, the Van left the warehouse. ECF 75 at 17. Enixae was the driver and Villapando was the passenger. *Id.* The Van returned to 106 John Avenue. *Id.*

Agent Wood testified that a pole camera was installed on March 8, 2016, at the rear of the Hammonds Ferry Road warehouse. No activity of significance was captured by the pole camera until April 6, 2016.

At approximately 10:30 a.m. on April 6, 2016, a tractor-trailer with the "KMKJ" logo arrived at the warehouse at 717 Hammonds Ferry Road. ECF 75 at 17. The "KMKJ" logo matched the logo seen on vehicles at the Golden Ring Road warehouse. The tractor-trailer was observed backing into the rear bay door of Unit L. *Id.* Photographs from the pole camera were introduced into evidence at the hearing. *See* government exhibits 4A-4D. According to Agent Wood, a forklift was used to remove pallets on the truck, and investigators believed the cargo contained cocaine.

The Van arrived at the warehouse at approximately 11:23 a.m., with two "Hispanic males." ECF 75 at 17. The Van travelled around the parking lot and warehouse building, "scanning the area." *Id.* Agent Wood indicated that the agents believed the two occupants were conducting counter-surveillance of the area. Two individuals exited the Van, believed to be Enixae and Hector. ECF 75 at 17. Both entered Unit L. *Id.* At approximately 1:30 p.m., the Van left the warehouse and proceeded to 106 John Avenue in Linthicum Heights. *Id.*

Agent Wood testified that the distance between the John Avenue residence and the warehouse is only about a mile, which is "significant." She explained that the close proximity is

intended to minimize "exposure" of the stash to police, because the travel distance is so short. *See also* government exhibits 2, 3 (aerial views of the area, including the warehouse and John Avenue residence).

Also at around 1:30 p.m., another "Hispanic male" left Unit L, unidentified by name, proceeded to the tractor-trailer parked in the back of the warehouse and directed it out of the lot. ECF 75 at 18. The individual then met the driver of a Chrysler 300 at a bank. *Id.* The Chrysler was rented by Santana Florencio, Jr., who had a California address. *Id.* The tractor-trailer returned to the lot at about 3:40 p.m. on April 6, 2016, and backed in at the bay doors. *Id.* The trailer was "release[d]" and the tractor exited the lot. *Id.*

DEA's Group 51 investigators maintained 24-hour surveillance of the warehouse at 717 Hammonds Ferry Road. ECF 75 at 18. This is because, according to Agent Wood, the agents believed drugs had been delivered to Suite L on April 6, 2016. She explained that drug dealers typically wait before taking further action.

Two days later, on April 8, 2016, at approximately 4:51 p.m., a black Honda with Maryland tag 68805CF arrived at the warehouse and "dropped off a Hispanic male wearing a red sweatshirt, later identified as Hector Hernandez Jr." *Id.* at 18. He entered Unit L through the rear door of the warehouse. The Honda left the parking lot. *Id.* At approximately 6:03 p.m., the Honda returned to the warehouse with Villapando and Enixae, both of whom entered Unit L through the rear door. *Id.* at 18-19.

At approximately 6:21 p.m., a "Hispanic male" left the warehouse, entered the Honda, and left the parking lot. *Id.* at 19. Wood identified the individual as Enixae. In particular, he drove around the lot and the "surrounding area of the warehouse." *Id.* at 19. According to

Wood, investigators regarded that conduct as suspicious. *See also* government exhibits 5A-5F (pole camera photos).

At approximately 6:30 p.m., the Honda proceeded to the front of the warehouse and exited, followed by a silver-colored Ford F- 150, Maryland tag 6CG4330. ECF 75 at 19. Both vehicles left the lot, travelled east on Nursery Road, and "met at a nearby road . . . ." ECF 75 at 19.[8] There, the two individuals in the vehicles were "making contact in the middle of the roadway." *Id.* Both vehicles then traveled back to the warehouse "in tandem." *Id.* The Honda parked in the lot, and the driver of the Honda entered the warehouse. *Id.* Wood testified that the driver was Enixae. The Ford F-150 proceeded to enter Unit L through the bay door. ECF 75 at 19. The bay door then closed. *Id.* A few minutes later, the Ford F-150 drove out of the warehouse. *Id.* According to Agent Wood, investigators believed that a drug transaction occurred inside the warehouse and that the Ford F-150 contained drugs obtained inside the warehouse.

Investigators stopped the Ford F-150 when it left the warehouse. *Id.* The driver, William Frederick Cornish, was asked to exit the vehicle. A Maryland State Police officer and her certified drug detection dog, "Akita," conducted a scan of the exterior of the vehicle, which resulted in a positive response to the odor of controlled dangerous substances, which included cocaine. ECF 75 at 19. The dog also alerted to the black Honda. *Id.* at 20.

After the drug detection dog alerted to the presence of controlled dangerous substances in the Ford F-150, investigators entered the Ford F-150 and found a large cardboard box in the back

[8] Agent Wood said the two vehicles met on Raynor Avenue.

seat of the truck. ECF 75 at 20. It contained "31 brick shaped packages of suspected narcotics." *Id.*[9]

According to Wood, investigators also observed Villapando, Hector, and Enixae exit Unit L through the front door. Believing a drug transaction had just taken place, all three men were arrested, without a warrant. In a search of Hector, keys to Unit L of the warehouse were recovered. At the time of the arrest, the arresting officers were unaware of the canine's positive alert to the two vehicles or to the recovery of suspected controlled dangerous substances in the Ford F-150. After the defendants were taken into custody, investigators secured the premises at 106 John Avenue and waited for a warrant to be obtained.

On the evening of April 8, 2016, Agent Sparrow submitted to a Maryland State judge an "Application And Affidavit For Search And Seizure Warrant" for 106 John Avenue in Linthicum Heights, Maryland. Among other things, Agent Sparrow described the property as a two story single family home. ECF 75 at 4. Further, Agent Sparrow averred that a BG&E utilities subpoena identified Enixae "as the main contact for the residence . . . ." *Id.* at 20.

In the Affidavit, Agent Sparrow set forth his extensive law enforcement training and experience with regard to drug trafficking, packaging, distribution, and surveillance. ECF 75 at 6-8. Sparrow asserted that drug traffickers "commonly utilize vehicles to pick up, transport, and deliver drugs" (*id.*at 7) and that they transport "drug proceeds to 'stash' locations . . . ." *Id.* at 8. The Affidavit also recounts several occasions when the Van was observed at the John Avenue residence and the Hammonds Ferry warehouse. Sparrow stated that, based on the investigation, he believed that the residence at 106 John Avenue was being used "for the purpose of offloading, concealment, and distribution of CDS shipments . . . ." ECF 75 at 20.

[9] Later investigation determined that a total of 31 kilograms of cocaine was recovered, with a wholesale value in Baltimore of approximately $1,000,000.

Anne Arundel County District Court Judge John McKenna signed the search warrant at 10:45 p.m. on April 8, 2016. ECF 75 at 3.

During a search of 106 John Avenue, pursuant to the warrant, investigators found three large duffel bags in the basement containing large amounts of US Currency, vacuum sealed in plastic bags and marked with monetary amounts on the outside of each plastic bag. Investigators believe that the duffel bags contain about $2.4 million dollars. Additionally, investigators located a drug/money ledger inside of 106 John Avenue, documenting just over $2.4 million dollars in receipts from the sale of illegal drugs. Documents were located in the residence bearing the names of Villapando and Enixae. Investigators also found two rolls of Blue Hawk Stretch Wrap.

A search of Unit 2 of the warehouse at 717 Hammonds Ferry Road yielded empty suitcases and empty duffle bags. Investigators also found cloth gloves, several rolls of scotch packaging tape, and several rolls of Blue Hawk Stretch Wrap, identical to the kind found at the John Avenue residence. In addition, they found a black bag that contained, among other things, bundles of plastic stretch wrap, consistent with the material used to wrap pallets containing goods for shipping. Investigators also located a forklift. Investigators observed a box located inside the warehouse with a FedEx label bearing an address of 10326 Hickory Ridge Road, Apartment 624, in Columbia, Maryland. This is an address previously used by Villapando. Investigators observed that there was nothing inside of the warehouse that would indicate that the premises were being utilized for a legitimate business.

Additional facts are included in the Discussion.

## II. Discussion

### A. Joinder and Severance

Hector Hernandez Barba has moved for relief from prejudicial joinder and to sever. ECF 42. He argues that there is a substantial risk the jury will confuse the evidence admissible against the various defendants. He points out that the "magnitude of the acts allegedly committed by the co-defendants exceed the separate acts" charged against him. *Id.* at 2. In his view, the jury will be unable "to properly segregate the evidence" as to each defendant. *Id.* at 1. Further, Hector insists that because there is "such a disparity of proof," the jury "cannot reasonably be expected to compartmentalize the evidence" as it relates to him. *Id.* at 2. In addition, he contends that his defense is "irreconcilable with and mutually exclusive to any defense which could be offered by his co-defendants." *Id.*[10]

Fed. R. Crim. P. 8(b) is titled "Joinder of Defendants." It states: "The indictment or information may charge 2 or more defendants if they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses." In general, "when defendants are indicted together, they should be tried together." *United States v. Dinkins*, 691 F.3d 358, 368 (4th Cir. 2012); *see United States v. Singh*, 518 F.3d 236, 255 (4th Cir. 2008). This is especially so when a conspiracy is charged. *United States v. Parodi*, 703 F.2d 768, 779 (4th Cir. 1983).

The Fourth Circuit has said: "Generally, we adhere to the rule that defendants charged with participation in the same conspiracy are to be tried jointly." *United States v. Akinkoye*, 185

[10] Hector also complains that a severance is needed because the government intends to introduce "other crimes" evidence as to the codefendants, which will be prejudicial to him. However, at the motions hearing the government agreed not to seek admission of other crimes evidence under Rule 404(b), although it reserved the right to seek to use prior convictions for impeachment. Therefore, the defendant's contention as to Rule 404(b) is moot.

F.3d 192, 197 (4th Cir. 1999); *see also United States v. Min*, 704 F.3d 314, 319 (4th Cir. 2013); *United States v. Gross*, 199 F. App'x 219, 232 (4th Cir. 2006). Notably, "there is a preference in the federal system for joint trials of defendants who are indicted together" because a joint trial "promote[s] efficiency and serve[s] the interests of justice by avoiding the scandal and inequity of inconsistent verdicts." *Zafiro v. United States*, 506 U.S. 534, 537 (1993) (internal quotation marks omitted).

Courts have recognized that severance creates an unnecessary burden and inefficiency for the court, the government, and the witnesses, by requiring the presentation of the same case on multiple occasions. Therefore, "[b]arring special circumstances, . . . the general rule is that defendants indicted together should be tried together for the sake of judicial economy." *United States v. Rusher*, 966 F.2d 868, 877 (4th Cir. 1992) (internal quotation marks omitted); *see also United States v. Tedder*, 801 F.2d 1437, 1450 (4th Cir. 1986) ("[J]oinder is highly favored in conspiracy cases, over and above the general disposition towards joinder for reasons of efficiency and judicial economy.") Claims of potential prejudice are generally addressed through limiting instructions, rather than severance. *See Zafiro*, 506 U.S. at 539; *United States v. Harris*, 498 F.3d 278, 291 (4th Cir. 2007); *United States v. Hayden*, 85 F.3d 153, 160 (4th Cir. 1996); Fed. R. Evid. 105.

Villapando, Enixae, and Hector are alleged to have entered into a conspiracy to distribute and possess with the intent to distribute large quantities of cocaine. In the first instance, I conclude that joinder is proper pursuant to F.R. Crim. P. 8(b).

This does not end the inquiry, however. Severance is governed by Rule 14 of the Federal Rules of Criminal Procedure, titled "Relief from Prejudicial Joinder." Rule 14 (a), titled "Relief," states, in part: "If the joinder of offenses or defendants in an indictment, an

information, or a consolidation for trial appears to prejudice a defendant or the government, the court may order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires."

When an indictment has properly joined multiple defendants, severance pursuant to Rule 14 is "rarely granted." *Dinkins*, 691 F.3d at 368. The question for the Court is whether a severance is required due to "a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro*, 506 U.S. at 539.

A defendant who moves for severance under Rule 14 has the burden of demonstrating "a strong showing of prejudice." *United States v. Goldman*, 750 F.2d 1221, 1225 (4th Cir. 1984); *accord United States v. Mir*, 525 F.3d 351, 357 (4th Cir. 2008). As the Fourth Circuit recognized in *United States v. Blair*, 661 F.3d 755 (4th Cir. 2011), it is a "difficult task," *id.* at 768, indeed a "daunting task," to demonstrate such a serious risk. *Id.* at 770.

Notably, "it is not enough to simply show that joinder makes for a more difficult defense." *Goldman*, 750 F.2d at 1225 (citing *United States v. Jordan*, 602 F.2d 171 (8th Cir. 1979), *cert. denied*, 444 U.S. 878, 100 (1979)). Moreover, severance is not appropriate merely because a defendant claims antagonistic defenses with his codefendants, or because it might improve a defendant's chances for acquittal. *United States v. Lighty*, 616 F.3d 321, 348 (4th Cir. 2010); *United States v. Reavis*, 48 F.3d 763, 767 (4th Cir. 1995); *United States v. Spitler*, 800 F.2d 1267, 1271 (4th Cir. 1986); *Goldman*, 750 F.2d at 1225. Nor is severance required because the evidence against one defendant is stronger than evidence against another defendant. *Singh*, 518 F.3d at 255; *Harris*, 498 F.3d at 291-92. "The mere presence of hostility among defendants . . . or a desire of one to exculpate himself by inculpating another [are also]

insufficient grounds to require separate trials." *Spitler*, 800 F.2d at 1271 (internal quotations marks and citation omitted).

Rather, a severance under Rule 14 is proper "only if there is a serious risk that a joint trial would . . . prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro*, 506 U.S. at 539; *see Min*, 704 F.3d at 319. "The rule requires more than finger pointing. There must be such a stark contrast presented by the defenses that the jury is presented with the proposition that to believe the core of one defense it must disbelieve the core of the other, or 'that the jury will unjustifiably infer that this conflict alone demonstrates that both are guilty.'" *United States v. Najjar*, 300 F.3d 466, 474 (4th Cir. 2002) (internal citation and citation omitted).

In many circumstances, a limiting instruction will cure any risk of prejudice arising from a joint trial. In some cases, however, a separate trial is required. For example, the *Min* Court said that, where an out-of-court-confession of a non-testifying codefendant is admissible against himself but inadmissible hearsay against another, and inculpates one or more of the other defendants, severance may be required under *Bruton v. United States*, 391 U.S. 123, 135-37 (1968). *See Min*, 704 F.3d at 319. The prejudice from introduction of a non-testifying codefendant's confession is so severe, even when the jury is instructed to consider the confession only against the codefendant, that it may violate the other defendant's Sixth Amendment right to confrontation. *Id.* at 320.

Here, the government represents that there are no known extra-judicial statements made by the codefendants which, if admitted at trial, would violate any defendant's Sixth Amendment right to confrontation under *Bruton v. United States*, 391 U.S. 123 (1968). Thus, the Sixth Amendment right to confrontation is not implicated.

Hector also argues that he would be prejudiced by a joint trial because his defense may be antagonistic to that of his conspirators, who happen to be his father and his brother. However, he presents no specifics to support his claim. Rather, his motion amounts to the kind of bald "finger pointing" that does not justify a severance. *See Najjar*, 300 F.3d at 474.

Nor is Hector entitled to severance merely because the evidence against his father and his brother is allegedly stronger or more inflammatory than the evidence against him. *United States v. Hall*, 93 F.3d 126, 131 (4th Cir. 1996) (rejecting defendant's argument "that evidence brought in against his codefendant . . . on [a related] murder charge may have 'inflame[d] the passions' of the jury"); *United States v. Brooks*, 957 F.2d 1138, 1145 (4th Cir. 1992); *United States v. Brugman*, 655 F.2d 540, 543 (4th Cir. 1981). As the government puts it, ECF 78 at 20, the argument of the risk of guilt by association "would run afoul of a bedrock principle of conspiracy law that a conspirator is liable for all acts and all declarations made or done in furtherance of the conspiracy. *See, e.g., United States Gypsum Co.*, 333 U.S. 364, 393 (1948)." And, Hector is not entitled to a severance because it might enhance his chance for acquittal. *Spitler*, 800 F.2d at 1271.

In sum, I agree with the government, which states, ECF 78 at 18: "The evidence against the three defendants is inextricably intertwined, and is nearly identical. Most notably, in order to establish the guilt of [each defendant], the same evidence will be used and the same witnesses would be called by the government." The concerns expressed by Hector can be addressed through limiting instructions. A severance is not warranted.

**B.**

Enixae and Hector moved to suppress evidence recovered pursuant to a search warrant for the residence at 106 John Avenue in Linthicum Heights. ECF 71 (Enixae); ECF 41 (Hector). Because Hector filed a skeletal motion, I shall focus on the allegations of Enixae.

Enixae contends that Agent Sparrow's Affidavit in support of the application for the search warrant lacked any basis from which the issuing judge could infer that contraband would be found at the residence. According to Enixae, the application and the Affidavit are devoid of "any nexus between the drug activity and the residence at 106 John Avenue." ECF 71 at 4. In his view, the search of the residence was "merely a fishing expedition" and the officers lacked any objectively reasonable basis for probable cause to search the residence. *Id.*

As noted, Special Agent Sparrow was the affiant for the search warrant application. His Affidavit, approximately 18 pages in length, sets forth in detail his training in narcotics investigations and operations as well as facts in support of probable cause for the search. *See* ECF 75 at 6-8. I incorporate here the facts previously set forth, but will refer to a few of them.

Among other things, a reliable CI disclosed that a group of persons was engaged in cocaine trafficking in Maryland, and using a warehouse located on Golden Ring Road in Baltimore in connection with the drug trafficking operation. A tractor-trailer with the "KMKG" logo was periodically seen at the site. The tenant was evicted, but left behind large quantities of a drug masking agent (paprika), a forklift, and a box truck. The box truck was traced to Villapando, whose photograph was identified by the CI as one of the persons involved in the cocaine trafficking.

Sparrow related that investigators initiated surveillance of 106 John Avenue in Linthicum Heights on February 19, 2016. ECF 75 at 14. A subpoena issued to BG&E revealed that Enixae was the "main contact" for the residence at 106 John Avenue. ECF 75 at 20.

A woman believed to be the wife of Enixae was seen entering the white 2004 Ford Van on February 19, 2016. ECF 75 at 14. At the time, the Van was parked in the driveway at 106 John Avenue. *Id.* At approximately 6:20 p.m. on that date, an Anne Arundel County police officer and a certified drug detection dog, Lara, conducted a scan of the Van. *Id.* at 14-15. The dog alerted to the presence of a controlled dangerous substance in the Van. *Id.* at 15. Thereafter, on February 19, 2016, Anne Arundel County District Court Judge Thomas Miller authorized the installation of a GPS tracking device for the Van. *Id.* Investigators subsequently saw Hector and Enixae operating the Van. *Id.* at 15-16.

On March 2, 2016, at approximately 9:00 a.m., electronic surveillance indicated that the Van was located at 106 John Avenue. *Id.* at 16. Thereafter, the Van left John Avenue and proceeded to the warehouse on Hammonds Ferry Road, where it remained from about 10:31 a.m. to 10:48 a.m. *Id.* It then proceeded to three different banks before returning to the Hammonds Ferry Road warehouse at about 1:17 p.m. *Id.* Then, at approximately 1:30 p.m., the Van left the warehouse and returned to 106 John Avenue. Enixae and Villapando were in the Van. ECF 75 at 17.

At about 10:42 a.m. on April 6, 2016, a tractor-trailer with the KMKG logo arrived at the Hammonds Ferry Road warehouse. That logo had been seen at the Golden Ring Road warehouse, where a large quantity of a narcotics masking agent had been found at the warehouse. At about 11:23 a.m., the Van was again observed at the Hammonds Ferry Road warehouse. Two subjects exited the Van, believed to be Enixae and Villapando. ECF 75 at 17.

Both entered Unit L of the warehouse. *Id.* At about 1:30 p.m., the Van left the warehouse and returned to 106 John Avenue.

As noted, on April 8, 2016, all three defendants entered Suite L of the warehouse. Then, Enixae left and met with the driver of a Ford F-150 in the middle of the road, on a side street, before returning to the warehouse. Upon return to the warehouse, the Ford F-150 entered Suite L through the bay doors and left soon after.

The investigation established ample evidence indicating that Suite L at the warehouse at Hammonds Ferry Road and the Van were used for drug trafficking purposes. The evidence clearly linked all three defendants to the drug activities, to the warehouse on Hammonds Ferry Road, and to the Van. Notably, on several occasions the defendants used the Van to travel between the John Avenue location, Villapando's residence, and/or the warehouse. The question here is whether the warrant application contained factual allegations adequate to establish probable cause to search the John Avenue residence for contraband.

The Fourth Amendment to the United States Constitution protects against unreasonable searches and seizures. *See Utah v. Strieff*, ____ U.S. ____, 136 S. Ct. 2056, 2060 (2016); *United States v. Medenhall*, 446 U.S. 544, 551 (1980). It provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

A judicially authorized warrant is the cornerstone of the Fourth Amendment. A constitutionally valid search warrant must describe with particularity the place to be searched and the items to be seized. *United States v. Davis*, 690 F.3d 226, 241 (4th Cir. 2013). And, it

must be supported by probable cause that contraband, evidence, fruits or instrumentalities of a crime, or a fugitive will be found at the location to be searched. F. R. Crim. P. 41(c); *United States v. Grubbs*, 547 U.S. 90, 96 (2006); *United States v. DeQuasie*, 373 F.3d 509, 520 (4th Cir. 2004).

The concept of probable cause cannot be defined with precision. It "exist[s] where the known facts and circumstances are sufficient to warrant a man of reasonable prudence in the belief that contraband or evidence of a crime will be found" in a particular place. *Ornelas v. United States*, 517 U.S. 690, 696 (1996). In the context of a search warrant, a probable cause assessment requires the issuing judge to decide whether, given the totality of the circumstances, "there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983); *accord United States v. Montieth*, 662 F.3d 660, 664 (4th Cir. 2011).

In the seminal case of *Illinois v. Gates*, 462 U.S. 213 (1983), the Supreme Court explained that "the central teaching of [its] decisions bearing on the probable-cause standard is that it is a 'practical, nontechnical conception.'" *Id.* at 231 (quoting *Brinegar v. United States*, 338 U.S. 160, 176). Similarly, in *Maryland v. Pringle*, 540 U.S. 366, 370 (2003), the Court reiterated that probable cause is a "practical, nontechnical conception that deals with the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." It is a "fluid concept" that is not "reduced to a neat set of legal rules." *Id.* Therefore, the issuing judge must make "a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Gates*, 462 U.S. at 238.

In reviewing a search warrant application, the judge who is asked to grant a warrant request need not abandon his or her common sense. In *United States v. Ventresca*, 380 U.S. 102, 108 (1965), the Court said:

> If the teachings of the Court's cases are to be followed and the constitutional policy served, affidavits for search warrants . . . must be tested and interpreted by magistrates and courts in a commonsense and realistic fashion. They are normally drafted by nonlawyers in the midst and haste of a criminal investigation. Technical requirements of elaborate specificity once exacted under common law pleadings have no proper place in this area. A grudging or negative attitude by reviewing courts toward warrants will tend to discourage police officers from submitting their evidence to a judicial officer before acting.

Thus, the probable cause standard "is not defined by bright lines and rigid boundaries. Instead, the standard allows a magistrate judge to review facts and circumstances as a whole and make a common sense determination of whether 'there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" *United States v. Williams*, 974 F.2d 480, 481 (4th Cir. 1992) (per curiam) (quoting *Gates*, 462 U.S. at 238); *see also United States v Wellman*, 663 F.3d 224, 228 (4th Cir. 2011); *United States v. Grossman*, 400 F.3d 212, 217 (4th Cir. 2005).

In determining whether probable cause exists, the issuing judge is confined to the averments contained in the four corners of the search warrant application. *Owens v. Lott*, 372 F.3d 267, 277 (4th Cir. 2004). Wholly conclusory statements in a warrant application ordinarily will not suffice. *See Gates*, 462 U.S. at 239 (citing *Nathanson v. United States*, 290 U.S. 41 (1933) and *Aguilar v. Texas*, 378 U.S. 108 (1964)). On the other hand, the probable cause standard does not "require officials to possess an airtight case before taking action. The pieces of an investigative puzzle will often fail to fit in neatly, and officers must be given leeway to draw reasonable conclusions from confusing and contradictory information." *Taylor v. Farmer*, 13 F.3d 117, 121 (4th Cir. 1993).

On review, the court's duty "'is simply to ensure that the magistrate had a substantial basis for concluding that probable cause existed.'" *United States v. Hodge,* 354 F.3d 305, 309 (4th Cir. 2009) (quoting *Gates,* 462 U.S. at 238-39); *see United States v. Bynum,* 293 F.3d 192, 202 (4th Cir. 2002). Indeed, the Supreme Court has "specifically cautioned against 'hypertechnical' scrutiny of affidavits lest police officers be encouraged to forgo the warrant application process altogether." *United States v. Robinson,* 275 F.3d 371, 380 (4th Cir. 2001) (quoting *Gates,* 462 U.S. at 236). Moreover, to effectuate the preference for warrants, great deference is accorded to the issuing judge's determination. *Gates,* 462 U.S. at 236; *United States v. Blackwood*, 913 F.2d 139, 142 (4th Cir. 1990). In *Massachusetts v. Upton,* 466 U.S. 727, 728 (1984) (per curiam), the Supreme Court said: "The task of a reviewing court is not to conduct a *de novo* determination of probable cause, but only to determine whether there is substantial evidence in the record supporting the magistrate's decision to issue the warrant."

Nevertheless, there are "limits beyond which a magistrate may not venture in issuing a warrant," *Gates*, 462 U.S. at 239, 103 S.Ct. 2317, and "[d]eference to the magistrate . . . is not boundless." *United States v. Leon*, 468 U.S. 897, 914 (1984). Thus, even a generous, non-technical review of a warrant cannot be used to scuttle the protections of the Fourth Amendment. "Sufficient information must be presented to the magistrate to allow that official to determine probable cause; his actions cannot be a mere ratification of the bare conclusions of others." *Gates,* 462 U.S. at 239. Therefore, "the Government cannot rely upon post hoc rationalizations to validate those seizures that happen to turn up contraband." *United States v. Foster*, 634 F.3d 243, 249 (4th Cir. 2011). Moreover, "'[p]olice officers generally have a duty to know the basic elements of the law they enforce.'" *United States v. Doyle*, 650 F.3d 460, 473 (4th Cir. 2011) (citation omitted).

In the face of a challenge to the warrant, the reviewing court must determine if the issuing judge had a substantial basis for concluding that the evidence sought would be discovered in the place described in the application and its affidavit. *See Upton*, 466 U.S. at 728. Given the urgency that is often associated with such matters, a law enforcement officer is not expected to prepare the kind of detailed statement that would serve as a textbook example of a model affidavit.

Of relevance here, "the nexus between the place to be searched and the items to be seized may be established by the nature of the items and the normal inferences of where one would likely keep such evidence." *United States v. Anderson*, 851 F.2d 727, 729 (4th Cir. 1988), *cert. denied*, 488 U.S. 1031 (1989); *see also United States v. Trice*, 621 Fed. App'x 151, 153 (4th Cir. 2015) (per curiam) (stating that a common-sense interpretation of the recorded conversation with a CI reasonably led to the conclusion that controlled dangerous substances would be found at the residence where the drug dealer was staying); *Doyle*, 650 F.3d at 471; *United States v. Richardson*, 607 F.3d 357, 371 (4th Cir. 2010). A warrant is not necessarily invalid for failure to set forth facts establishing a direct link to the items sought at a particular residence. *Anderson*, 851 F.2d at 729; *see Doyle*, 650 F.3d at 471; *Richardson*, 607 F.3d at 371; *see also United States v. Ortiz*, 422 U.S. 891, 897 (1975) (stating that "officers are entitled to draw reasonable inferences from the[] facts in light of their knowledge of the area and their prior experience. . . ."); *United States v. Brignoni-Ponce*, 422 U.S. 873, 885 (1975) (concluding that "the officer is entitled to assess the facts in light of his experience. . . ."); *United States v. Moore*, 477 Fed. Appx 102, 105 (4th Cir. 2012); *United States v. Williams*, 548 F.3d 311 (4th Cir. 2008); *Grossman*, 400 F.3d at 217; *United States v. Servance*, 394 F.3d 222, 230 (4th Cir. 2005),

*vacated on other grounds*, 544 U.S. 1047 (2005); *Williams*, 974 F.2d at 481-82 (4th Cir. 1992); *United States v. Cureton*, RDB-16-0087, 2017 WL 889030 (D. Md. Mar. 6, 2017).

In the 2008 *Williams* case, 548 F.3d 311, the Fourth Circuit said that it has "consistently determined that there was probable cause to support search warrants" for suspects' residences "on the basis of 1) evidence of the suspects' involvement in drug trafficking combined with 2) the reasonable suspicion (whether explicitly articulated by the applying officer or implicitly arrived at by the magistrate judge) that drug traffickers store drug-related evidence in their homes." *Id*. at 319. Moreover, the Court was of the view that "the district court erroneously discounted [the agent's] assertion of training-and experience-based knowledge to tie [the defendants'] drug trafficking activities to their residences." *Id.* at 320.

In the 1992 *Williams* case, 974 F.2d 480, the affidavit in support of the search warrant established that the defendant had a criminal history involving drug trafficking; his car contained drug residue and a knife; he had a receipt for a motel room; and the affidavit set forth evidence that the defendant was living at the motel. The Court said, *id.* at 481: "With this evidence before him, the magistrate must consider, in light of all of the surrounding circumstances, the likelihood that drug paraphernalia would be found in the motel room of a known drug dealer." The Court rejected the defendant's claim that the warrant did not support the magistrate's conclusion allowing the search. *Id.* at 482.

And, in *Anderson*, 851 F.2d 727, the Court determined that probable cause existed to search a trailer for weapons, although the affidavit did not include facts indicating weapons were in the trailer. *Id.* at 729. The Court agreed with the reasoning articulated in cases from other circuits, establishing that probable cause can be established based on the nexus between the place to be searched, the items to be seized, and the normal inferences of where one would likely keep

such items. *Id.* at 729. Notably, many courts have said that it is reasonable to infer that evidence of involvement in the drug trade is likely to be found where the dealer resides. *See, e.g.*, *United States v. Feliz*, 182 F.3d 82, 87-88 (1st Cir. 1999); *United States v. McClellan*, 165 F.3d 535, 546 (7th Cir. 1999); *United States v. Henson*, 123 F.3d 1226, 1239 (9th Cir. 1997); *see United States v. Jacobs*, 715 F.2d 1343 (9th Cir. 1983) (holding it reasonable for magistrate to conclude that articles of clothing could be found at suspect's residence); *United States v. Steeves*, 525 F.2d 33 (8th Cir. 1975) (concluding that people who own weapons generally keep them at home); *United States v. Rahn*, 511 F.2d 290 (10th Cir.) (finding it reasonable to assume that individuals store their weapons at home), *cert. denied*, 423 U.S. 825 (1975).

To be sure, in *United States v. Lalor*, 996 F.2d 1578, 1583 (4th Cir. 1993), the Court said that "residential searches have been upheld only where some information links the criminal activity to the defendant's residence." But, *United States v. Grossman*, *supra*, 400 F.3d 212, also provides guidance. There, the Fourth Circuit determined that "it is reasonable to suspect that a drug dealer stores drugs in a home" for which he possesses a key. *Id.* at 218.

In *Grossman*, the defendant challenged the nexus between his alleged drug offenses and three homes to which he had access, but in which he did not reside. *Id.* at 214. Law enforcement officers were informed by a confidential informant about the defendant's drug trafficking activities. *Id.* at 214. The detectives then conducted surveillance and observed the defendant exit his vehicle (which had been described to the officers by the confidential informant), and used a set of keys to open the front door. *Id.* at 215. The defendant then exited the house and walked toward a different car. *Id.* Before the defendant entered the other car, he was stopped and questioned by the detectives. *Id.* The defendant made "several plainly false statements" to the police. *Id.* at 215.

Thereafter, the detectives obtained a search warrant for the residence that they had seen the defendant enter and exit. *Id.* When the warrant was executed, the detectives seized a large sum of cash, a loaded handgun, and documents addressed to the defendant at a different address. *See id.* One of the detectives went to the address listed on the documents. *Id.* The detective knocked on the door but no one responded. *See id*. The detective then determined that one of the defendant's keys opened the door to the residence. The detective obtained a warrant to search the second residence. *See id.* The search of the second residence revealed a large sum of cash and approximately 4.5 kilograms of cocaine. *Id.* at 216. The detectives obtained and executed a warrant for a third address after learning that the defendant sometimes stayed with his aunt at the third address. *See id.*

The defendant moved to suppress the evidence seized in all three searches. *See Grossman*, 400 F.3d at 216. The Fourth Circuit affirmed the district court's denial of the defendant's motion to suppress, concluding that the evidence was sufficient to justify the issuance of the search warrants, and reiterating that "a sufficient nexus can exist between a defendant's criminal conduct and his residence even when the affidavit supporting the warrant 'contains no factual assertions directly linking the items sought to the defendant's residence.'" *Id.* at 217 (citing *Servance*, *supra*, 394 F.3d at 230). Significantly, the Court said that "it is reasonable to suspect that a drug dealer stores drugs in a home to which he owns a key." *Id.* at 218. The Court added that the searches were not invalid merely because the defendant "splits his time among several different homes." *Id.*; *see also United States v. Sanders*, 272 Fed. Appx. 271, 273 (4th Cir. 2008) (per curiam) (quoting *Grossman*).

Here, on February 19, 2016, a certified drug detection dog alerted to the presence of drugs in the Van. Moreover, the defendants were observed in the Van on several occasions.

And, the Van was used to travel between the warehouse, the John Avenue residence, and Villapando's residence. Moreover, BG&E identified Enixae as the "main contact" at the John Avenue residence. Notably, he was at the warehouse on April 6, when the KMKG tractor-trailer was present. He was also at the warehouse on April 8, 2016, and was also observed conversing in the middle of a side street with the driver of the F-150 Ford truck, which then returned to the warehouse and drove inside of it. Sparrow expressed his belief that the John Avenue residence was used to conceal controlled dangerous substances. His extensive experience in the investigation of drug trafficking, outlined in his Affidavit, gave credence to his belief. The issuing judge could readily infer that Enixae, a suspected cocaine drug dealer, stored contraband at his residence.

To be sure, the Affidavit could have been more explicit about the link to John Avenue. But, as indicated, the Affidavit need not be a model of perfection to pass constitutional muster. The Affidavit recounts an extensive investigation linking the defendants to cocaine distribution. The issuing judge was entitled to infer from the Affidavit that contraband would be found at the John Avenue residence, a location that was frequented by Enixae and the other defendants.

Even if the search warrant were not supported by probable cause, this would not end the inquiry. Deterrence "is not achieved through the suppression of evidence obtained by 'an officer acting with objective good faith,'" pursuant to a search warrant issued by a judicial officer. *United States v. Perez*, 393 F.3d 457, 461 (4th Cir. 2004) (citation omitted).

In *United States v. Leon*, 468 U.S. 897 (1984), and the companion case of *Massachusetts v. Sheppard*, 468 U.S. 981 (1984), the Supreme Court announced the good faith exception to the exclusionary rule. Notwithstanding the importance of the exclusionary rule to Fourth Amendment jurisprudence, the Supreme Court determined in *Leon* that suppression of evidence

obtained pursuant to a warrant should be ordered only on a case-by-case basis, and only in those unusual cases in which exclusion will further the purposes of the exclusionary rule. *Leon,* 468 U.S. at 918. In *Sheppard*, 468 U.S. at 989-90, the Supreme Court added: "[W]e refuse to rule that an officer is required to disbelieve a judge who has just advised him . . . that the warrant he possesses authorizes him to conduct the search he has requested."

In establishing the good faith exception to the exclusionary rule, *Leon* provided for the admissibility of evidence seized pursuant to a warrant subsequently determined to be invalid, if the executing officer's reliance on the warrant was "objectively reasonable." *Leon,* 468 U.S. at 922; *see Herring v. United States*, 555 U.S. 135, 145 (2009); *Doyle,* 650 F.3d at 467; *Perez,* 393 F.3d at 461. Under this doctrine, the trial court must determine whether evidence recovered during a search pursuant to a warrant later determined to be invalid is nonetheless admissible because the executing officers acted in objective good faith in relying on the warrant. *Leon*, 468 U.S. at 919-20; *Sheppard*, 468 U.S. at 987-88.

Ordinarily, a "'warrant issued by a magistrate . . . suffices to establish' that a law enforcement officer has 'acted in good faith in conducting the search.'" *Leon,* 468 U.S. at 922 (citation omitted). The *Leon* Court explained that the standard for assessing the officer's good faith reliance on the magistrate's probable cause determination is one of objective reasonableness. The "good-faith inquiry is confined to the objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal . . . ." 468 U.S. at 922 n.23; *see United States v. McKenzie-Gude*, 671 F.3d 452, 459 (4th Cir. 2011).[11]

[11] In making a *Leon* good faith determination, courts may look "outside the four corners of a deficient affidavit when determining, in light of all the circumstances, whether an officer's reliance on the issuing warrant was objectively reasonable." *McKenzie-Gude*, 671 F.3d at 459.

*Leon* identified four circumstances when exclusion of evidence remains the appropriate sanction, even if an officer has obtained a warrant and abided by its terms. *Leon*, 468 U.S. at 922. These four circumstances are as follows: 1) if the magistrate or judge who issued the warrant was misled by information in an affidavit that the affiant knew was false or would have known but for his reckless disregard for the truth; 2) if the issuing magistrate wholly abandoned his judicial role; 3) the affidavit supporting the warrant is "'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable'"; 4) the warrant is so "facially deficient -- i.e., in failing to particularize the place to be searched or the things to be seized that the executing officers cannot reasonably presume it to be valid." *Leon,* 468 U.S. at 923 (citations omitted); *see DeQuasie*, 373 F.3d at 519-520.

In *Lalor*, 996 F.2d at 1582, the Fourth Circuit found the affidavit "devoid of any basis from which the magistrate could infer that evidence of drug activity would be found" at the premises to be searched. The Court noted that the affidavit failed to describe circumstances to indicate that such evidence was likely to be stored at the defendant's residence. Nevertheless, the Fourth Circuit concluded that the warrant was not so lacking in probable cause that the officer's reliance upon it was objectively unreasonable. *Lalor*, 996 F.2d at 1583. Therefore, the good faith exception was upheld. *Id.* at 1584.

Against this background, I am mindful of what the Supreme Court said in *Davis v. United States*, 564 U.S. 229 (2011), in regard to the exclusionary rule. "Exclusion [of evidence] is 'not a personal constitutional right,' nor is it designed to 'redress the injury' occasioned by an unconstitutional search." *Id.* at 236 (citation omitted). Rather, its purpose is to "deter future Fourth Amendment violations." *Id.* at 236-37. Thus, "[e]xclusion of evidence only is

appropriate if the deterrence benefits of suppression outweighs the heavy societal costs of exclusion." *United States v. Wilks*, 647 F.3d 520, 523 (4th Cir. 2011).

Even assuming, *arguendo*, that the search warrant was not supported by probable cause to search the John Avenue residence, the DEA agents acted in objective good faith in relying on the search warrant. There is no indication that Agent Sparrow acted recklessly, nor was he dishonest or grossly negligent. Moreover, the Affidavit reveals an extensive investigation and is detailed in many respects. Accordingly, the good faith doctrine enunciated in *Leon* would govern the disposition of this issue. The drastic sanction of exclusion would be entirely disproportionate to any law enforcement oversight, and would not serve the ends of justice.[12]

**C.**

Hector has moved to suppress the keys to the warehouse, recovered from him during a search incident to his warrantless arrest on April 8, 2016. ECF 41.

All three defendants were arrested, without a warrant, as they were leaving the warehouse property at 717 Hammonds Ferry Road on April 8, 2016. The arrest occurred almost simultaneously with the stop of the Ford F-150 truck, but before the canine alert to the truck and the subsequent discovery of the bricks of cocaine in that vehicle.

I incorporate here the factual summary set forth earlier, but I will highlight some of the facts. I also incorporate here the probable cause standard that was previously discussed, at length.

As indicated, the investigation began in August 2015, when the DEA in Baltimore received information from a confidential informant regarding a group of individuals trafficking

[12] In view of my disposition, I need not address the government's assertion in ECF 78 that the codefendants lack standing to challenge the search of 106 John Avenue.

large amounts of cocaine into Maryland. According to the CI, the group was utilizing a warehouse in Baltimore, located at 7110 Golden Ring Road, Suite 104, as a distribution point. Further, the CI advised that shipments of cocaine occurred by truck, every two to three weeks. ECF 75 at 8. In his Affidavit, Agent Sparrow averred, *id.* at 9: "The CI has provided information that has been independently corroborated, and has been found to be reliable and accurate." The Affidavit in support of the search warrant then recounted significant investigation by the DEA office in Baltimore, and it reflected considerable corroboration of the details provided by the CI.

The individuals operating from Suite 104 at 710 Golden Ring Road were evicted on July 31, 2015. ECF 75 at 9. On December 1, 2015, DEA investigators interviewed neighboring businesses in an effort to obtain information as to the activities of the individuals operating out of Suite 104. That business was identified as KMKG Trucking. *Id.* According to Agent Sparrow's Affidavit, investigators interviewed an associate with Plycon Van Lines, Inc., a neighboring business. *Id.* That individual indicated that he/she never saw any activity during the day at Suite 104, but individuals came and went at night, *i.e.*, after 6:00 p.m. Among other things, the individual entered the warehouse after the eviction and observed "large industrial size bags of paprika inside the warehouse." *Id.* at 10. Agent Sparrow stated that, based on his knowledge, training and experience, the individuals operating out of Suite 104 "were utilizing the bags of paprika to attempt to mask the odor of CDS, either during transport to the warehouse, or during transport to customers . . . ." ECF 75 at 10.

The DEA continued contact with the CI, who positively identified Villapando as one of the individuals involved in the drug trafficking scheme. ECF 75 at 11-12. In addition, Wood

testified that the CI also identified a photograph of Enixae as an individual involved in the drug trafficking operation. Both men had been arrested previously on drug charges.

The suspects were observed using a white Ford Van. As indicated earlier, that Van had been subjected to a canine scan on February 19, 2016, and a certified drug detection dog alerted to the presence of controlled dangerous substances.

The investigation led the DEA to Suite L at the warehouse on Hammonds Ferry Road, which was surveilled both by a pole camera and by agents directly. Agents who had been surveilling the scene were of the view that Suite L was not an ongoing business, but rather a location to receive drugs and as a way station for further distribution.

Agent Wood testified that the DEA first learned of Hector's involvement in March 2016. In particular, Wood testified that Hector was observed with Exinae on several occasions that month. He was also seen at the John Avenue residence and in the Van. Moreover, as both Agent Wood and Agent Sparrow stated, Hector entered the Hammonds Ferry Road warehouse with his brother on April 6, 2016. He also was at the warehouse on April 8, 2016. On both occasions, according to Agent Wood, drug transactions were believed to have occurred.

At approximately 10:42 a.m. on April 6, 2016, a tractor-trailer with the "KMKG" logo arrived at the warehouse at 717 Hammonds Ferry Road in Linthicum Heights. That logo was linked to vehicles seen at the Golden Ring Road location. Investigators also observed the movement of palettes from the trailer to the warehouse with a forklift. Agent Wood indicated that agents believed drugs were secreted in the palettes. Then, at about 11:23 a.m., the Van arrived. Both Enixae and Hector exited the Van and entered Unit L of the warehouse. The Van left the warehouse at about 1:30 p.m. and proceeded to 106 John Avenue. At about 11:20 p.m., the Van returned to the warehouse, where it was observed conducting surveillance of the area,

driving around the building. Thereafter, Enixae and Hector exited the Van and entered Unit L of the warehouse, where they remained until approximately 1:30 p.m. At that time, they proceeded in the Van to 106 John Avenue. The tractor trailer returned to the warehouse at about 3:30 p.m. and backed in through the bay doors.

Twenty-four hour surveillance of the warehouse was conducted. At approximately 4:51 p.m. on April 8, 2016, a black Honda, Maryland tag 68805CF, arrived at the warehouse. ECF 75 at 18. Hector exited the Honda and entered the warehouse. *Id.* Enixae returned in the Honda with Villapando at about 6:03 p.m. ECF 75 at 18-19. Both men entered Suite L. According to Wood, Enixae left the warehouse at about 6:21 p.m. and again entered the black Honda. *Id.* at 19. He drove around the lot and surrounding area in a suspicious manner, as if conducting surveillance. When Enixae left the lot at about 6:30 p.m., he was joined by a Ford F-150. Both vehicles met on a side road, where the men conversed before returning to Suite L. Enixae then entered the warehouse and the Ford F-150 proceeded to enter via the bay doors. ECF 75 at 19. Soon after, the Ford F-150 exited the warehouse.

Agent Wood testified that when the Ford F-150 entered and then left the warehouse on Hammonds Ferry Road, the agents believed that a drug transaction had occurred inside the warehouse. Moreover, agents believed all three defendants were involved in the drug transaction, based on facts already presented. She noted that two days elapsed since what agents believed was a delivery of drugs in the KMKG tractor-trailer and all three defendants arrived at the warehouse just before a transaction occurred inside, involving the Ford F-150.

At the outset, I note that, under the collective-knowledge doctrine, a court may "'substitute the knowledge of the *instructing officer or officers* for the knowledge of the *acting officer*; it does not permit [a court] to aggregate bits and pieces of information from around

myriad officers.'" *United States v. Patiutka*, 804 F.3d 684, 691 (4th Cir. 2015) (quoting *United States v. Massenburg*, 654 F.3d 480, 493 (4th Cir. 2011)) (emphasis in *Massenburg*; alteration in *Patiutka*); *see also Whiteley v. Warden*, 401 U.S. 560, 568 (1971); *United States v. Herevia*, RDB-13-639, 2014 WL 4784321 at *5 (D. Md. Sept. 23, 2014).

A warrantless arrest, as well as a search incident thereto, is permitted under the Fourth Amendment if there is probable cause to believe that a felony is being or has been committed by the arrested individual, based upon "the totality of the circumstances." *Gates*, 462 U.S. at 230-31; *see also Pringle*, 540 U.S. at 370; *United States v. Collins*, 412 F.3d 515, 518 (4th Cir. 2005); *United States v. Dickey-Bey*, 393 F.3d 449, 453 (4th Cir. 2004).

In *United States v. Gray*, 137 F.3d 765 (4th Cir.) (en banc), *cert. denied*, 525 U.S. 866 (1998), the Fourth Circuit said, *id.* at 770 (emphasis in original): "Because probable cause is an objective test [the Fourth Circuit] examine[s] the facts within the knowledge of arresting officers to determine whether they provide the probability on which reasonable and prudent persons would act; [it does] not examine the subjective beliefs of the arresting officers to determine whether *they* thought that the facts constituted probable cause." (Citation omitted). And, as indicated in *Pringle*, in determining whether there was probable cause, the Court must look to the totality of the circumstances. *Pringle*, 540 U.S. at 370-71; *see also United States v. Humphries*, 372 F.3d 653, 656 (4th Cir. 2004).

At the hearing, defense counsel argued that DEA agents lacked probable cause for the warrantless arrest of Hector. In his view, the mere presence of Hector at the scene did not give rise to probable cause to arrest him. However, this was not a matter of mere presence at the scene. Nor was it a matter of the proverbial guilt by association. To the contrary, the agents had ample basis to believe that all three defendants participated in a drug transaction on April 6 and

April 8, 2016. The law does not require all three defendants to have the same level of involvement.

## III. Conclusion

There is no merit to the defense motions. They shall be DENIED. An Order follows.

Date: April 5, 2017

/s/
Ellen L. Hollander
United States District Judge